IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| SENDERRA RX PARTNERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:18-CV-871 |
| | ) | |
| BLUE CROSS AND BLUE SHIELD OF NORTH CAROLINA, | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, District Judge.

The plaintiff, Senderra Rx Partners, LLC, contends it suffered lost profits when Blue Cross and Blue Shield of North Carolina did not allow Senderra to participate in its specialty pharmacy network in violation of the North Carolina "Pharmacy of Choice" statute, fraudulently misrepresented the requirements to participate in the network, and committed unfair and deceptive trade practices. Because there are no disputed questions of material fact and the evidence shows that Senderra is not aggrieved by BCBSNC's allegedly unlawful actions, BCBSNC's motion for summary judgment will be granted.

## FACTS

The evidence material to this motion is largely undisputed. To the extent it is not, the Court states the evidence in the light most favorable to Senderra, the non-moving party. *See Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). The facts are summarized here and supplemented elsewhere as the need arises.

Senderra is a specialty pharmacy that began participating in BCBSNC's specialty pharmacy network in 2015. Doc. 7-1 at ¶ 8. Senderra filled prescriptions for persons insured under BCBSNC plans by mail from a Texas dispensary. Doc. 49 at ¶ 17; *see* Doc. 137-5 at 6.

In April 2018, BCBSNC notified participating pharmacies, including Senderra, that it was updating its network requirements and contracts effective September 1, 2018. Doc. 17; *see also* Doc. 89 at ¶ 5 (showing receipt by Senderra). BCBSNC also told the pharmacies that they would receive a "notice of removal" pursuant to the existing network agreement unless they submitted a form verifying that they were in compliance with the new network requirements by June 8, 2018. Doc. 17. On May 7, 2018, BCBSNC sent each participating pharmacy, including Senderra, an email with more information on the new network, including the new network participation agreement and the special pharmacy addendum. *Id.* at ¶ 6; *see* Doc. 69-1 at 11–79.

When Senderra joined the network in 2015, BCBSNC required participants to have a "staffed business office" in North Carolina. Doc. 55-2 at 2. The new terms, however, included a requirement that providers have "a dispensing location" in North Carolina. Doc. 69-1 at 71. Senderra immediately recognized that satisfying the in-state dispensing requirement would be difficult, given the short timeframe it had to submit proof of compliance. *See* Doc. 55-2.

In June 2018, Senderra timely applied to join the new network, noting in its application that it had a "staffed business office" in North Carolina without identifying an in-state dispensing location. Doc. 19 at 8. BCBSNC confirmed with Senderra that

2

Senderra did not have a dispensing pharmacy in North Carolina. Doc. 23 at 2–3. On July 11, 2018, consistent with the provisions of the April letter and existing contract, BCBSNC notified Senderra that the 2015 Agreement would be terminated effective October 15, 2018. Doc. 1-2.

Thereafter, employees of Senderra and BCBSNC exchanged emails and had conversations about the in-state dispensing requirement, and Senderra began the work needed to comply with the requirement. In the fall, Senderra bought a business in North Carolina and converted it into a dispensing pharmacy. Doc. 7-1 at ¶ 15. But as of October 15, 2018, Senderra did not have a permit from the North Carolina Board of Pharmacy to operate this dispensary, *see* Doc. 138-1 (noting the permit was issued November 5, 2018), and the contract with BCBSNC ended. Many pharmacies met the new requirement, and every pharmacy admitted into the new network had an in-state dispensing location with a state permit. *See* Doc. 48 at ¶¶ 9, 15, 32, 49–53.

BCBSNC included as a term of participation that pharmacies seeking to gain entry to the network must "submit all necessary paperwork that BCBSNC requires by 10/1 for a 1/1 entry date, and by 4/1 for a 7/1 entry date." Doc. 18 at p. 14 ¶ 2.14. Senderra did not provide the necessary paperwork by October 1, as it did not have a state permit on that date. Thus, under the terms of the new agreement, the earliest date BCBSNC would allow Senderra—a pharmacy not in the network seeking to gain entry—to rejoin the network was July 1, 2019, if Senderra met the requirements by April 1, 2019.

After it received its permit from the Board of Pharmacy, Senderra reapplied to participate in the network on November 5, 2018. 138-2 at 7. BCBSNC rejected the

3

application because Senderra had not shown that the North Carolina location had obtained other credentials required by BCBSNC for the in-state dispensary, specifically a Medicare certification and a URAC credential. Doc. 36-2.

None of the written materials BCBSNC sent to the providers explicitly stated that pharmacies had to obtain a Medicare certification or URAC credential specifically for their North Carolina dispensing location or that pre-existing credentials for other, out-of-state locations owned by the same pharmacy would not suffice. *See* Doc. 69-1 at 11–79. But Senderra was aware from its previous dealings with BCBSNC that it had a credentialing process. *See* Doc. 49 at ¶¶ 15–18; Doc. 55-1 at 3. And the new participation agreement, which was provided to Senderra and others, did say that the provider "agree[d] to participate and comply with all of [BCBSNC's] Policies and Procedures" and that the policies and procedures would be provided to pharmacies "by hard copy, CD, or other electronic format, or by posting on [BCBSNC's] website." Doc. 69-1 at p. 21 §§ 2.3.1, 2.3.1.1. The information on BCBSNC's website and in the "BlueBook," the provider manual, specifically discussed credentialing requirements, *see* Doc. 26; Doc. 88 at ¶¶ 6–15, including the URAC credential. Doc. 88 at ¶ 14.

Before October 15, 2018, BCBSNC admitted two pharmacies, Avita Pharmacy and Long's Drugs, into the new network even though their in-state dispensaries did not have the URAC credential. Doc. 36-3 at 3–4; Doc. 48 at ¶ 41. A BCBSNC manager erroneously assumed that pharmacies with permitted locations also had the URAC credential. Doc. 48 at ¶¶ 23, 41. Those in-state dispensaries had permits from the North Carolina Board of Pharmacy, unlike Senderra. Doc. 48 at ¶¶ 13–15.

4

In March 2019, Senderra obtained its URAC credential and, in advance of the April 1 deadline, it reapplied to participate in BCBSNC's network. Doc. 89 at ¶¶ 8–9. The parties executed a new participation agreement, and Senderra reentered the network on July 1, 2019. *Id.* at ¶¶ at 10–11.

As a result of these events, Senderra did not participate in the network from October 15, 2018, through July 1, 2019. Senderra contends this exclusion caused it to lose millions of dollars in revenue and profits.

## ANALYSIS

Senderra has three remaining claims against BCBSNC.[1] First, Senderra contends that BCBSNC violated the North Carolina "Pharmacy of Choice" statute, N.C. Gen. Stat. § 58-51-37, by "failing to provide sufficient information as to the various requirements for a dispensing location" and issuing "vague, incomplete, and conflicting" instructions on how to satisfy the requirements, and by enforcing the requirements with "unequal force and manner." *See* Doc. 36 at ¶¶ 48–61. Second, Senderra contends BCBSNC falsely represented its credentialing requirements and how Senderra could satisfy the requirements in their communications with Senderra between July 19, 2018, and November 2, 2018. *Id.* at ¶¶ 79–86.[2] Third, Senderra contends that BCBSNC committed

---

[1] The Court dismissed parts of Senderra's Chapter 75 and fraud claims in its order granting- and denying-in-part BCBSNC's motion for to dismiss. *See generally* Doc. 79. For clarity and ease of reading, the Court has summarized Senderra's causes of actions only as they survived.

[2] The Court dismissed Senderra's fraud claim to the extent it was based on (1) BCBSNC's failure to affirmatively disclose the credentialing requirements, as BCBSNC had no common law duty to disclose; and (2) concealments or misrepresentations about applying the terms of

5

unfair trade practices in violation of N.C. Gen. Stat. § 75-1.1, by its disparate treatment of Senderra, its failure to make terms and conditions available to Senderra, and its misrepresentations about participation requirements. *Id.* at ¶¶ 62–69.[3]

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Thus, if the evidence would permit a jury to find in the non-movant's favor on a disputed question of material fact, summary judgment is inappropriate." *EEOC v. McLeod Health, Inc.*, 914 F.3d 876, 880 (4th Cir. 2019).

## I.  Chapter 58 Pharmacy of Choice Claims

The North Carolina "Pharmacy of Choice" statute in Chapter 58 applies to "insurance companies . . . that provide or administer coverages and benefits for prescription drugs" and "all health benefit plans providing pharmaceutical services benefits, including prescription drugs, to any resident of North Carolina." N.C. Gen. Stat. § 58-51-37(a). As is relevant here, the statute provides that the terms of a health benefit plan shall not:

> --  Prohibit or limit a resident of this State. . .from selecting a pharmacy of his or her choice when the pharmacy has agreed to participate in

---

participation equally to all pharmacies, as such statements were not the cause of alleged harm. Doc. 79 at 21–22.

[3] The Court dismissed Senderra's Chapter 75 claim to the extent it was based on: (1) BCBSNC notifying Senderra's patients that Senderra would be terminated from the network; and (2) imposing requirements that are "not reasonable and relevant." Doc. 79 at 14–15.

6

>> the health benefit plan according to the terms offered by the insurer.
> § 58-51-37(c)(1) (immaterial provisions deleted for clarity).

-- Deny a pharmacy the opportunity to participate as a contract provider under a health benefit plan if the pharmacy agrees to provide pharmacy services that meet the terms and requirements of the insurer. § 58-51-37(c)(2) (immaterial provisions deleted for clarity).

-- Impose a monetary advantage or penalty that would affect a beneficiary's choice of pharmacy. § 58-51-37(c)(4).

The statute further provides that a "violation of this section creates a civil cause of action for damages or injunctive relief in favor of any person or pharmacy aggrieved by the violation." N.C. Gen. Stat. § 58-51-37(h).

BCBSNC asserts that this statute does not apply to the pharmacy network at issue in this case. In the alternative, it contends that Senderra has not shown a violation.

### A. The statute applies to the specialty pharmacy network

The Court—sitting in diversity—applies state law principles of statutory construction, as enunciated and applied by the North Carolina Supreme Court. *See Volvo Trademark Holding Aktiebolaget v. Clark Mach. Co.*, 510 F.3d 474, 482 (4th Cir. 2007). A clear and unambiguous statute must be construed using its plain meaning. *Burgess v. Your House of Raleigh, Inc.,* 326 N.C. 205, 209, 388 S.E.2d 134, 136 (1990). By its terms, the "Pharmacy of Choice" statute "shall apply to all health benefit plans providing pharmaceutical services benefits, including prescription drugs, to any resident of North

7

Carolina," § 58-51-37(a), and the three prohibitions at issue apply specifically to health benefit plans. N.C. Gen. Stat. §§ 58-51-37(c)(1), (2), (4).

BCBSNC provides health insurance policies that are "health benefit plans," as that term is defined in § 58-51-37(b)(3) and § 58-50-110(11). Doc. 155 at ¶ 1. These health benefit plans provide pharmaceutical services benefits, including prescription drugs, to residents of North Carolina, as described in § 58- 51-37(a). *Id.* at ¶ 2. The "Pharmacy of Choice" statute applies to these health benefit plans per § 58-51-37(a). Doc. 154 at ¶ 3; *see* Doc. 155 at 1.

Under most of BCBSNC's health benefit plans, for specialty drug prescriptions to be reimbursed at the highest level, beneficiaries and participants must fill the prescription at a specialty pharmacy within BCBSNC's network. Doc. 155 at ¶¶ 4–5. BCBSNC allows pharmacies to participate as contract providers to supply services for these health benefit plans through a network participation agreement. *Id.* at ¶ 7. Once a pharmacy and BCBSNC execute the participation agreement, the pharmacy is part of BCBSNC's specialty pharmacy network. Doc. 154 at ¶ 9; *see* Doc. 155 at 1. Pharmacies within BCBSNC's specialty pharmacy network participate as "contract providers" as that term is defined in § 58-51-37(b)(2), for a health benefit plan, as described in § 58-51-37(c)(2). Doc. 155 at ¶ 10.

Here, BCBSNC is an insurer offering "health benefit plans" to residents of North Carolina. *Id.* at ¶¶ 1–2. While the terms of the different plans that BCBSNC offers vary to some extent, under most if not all of the relevant plans, beneficiaries and participants pay less out of pocket for specialty drug prescriptions filled at a specialty pharmacy

8

within BCBSNC's network. *Id.* at ¶¶ 4–5. The network participation agreement is the contract between BCBSNC and each pharmacy participating in its specialty pharmacy network in which the pharmacy agrees to provide pharmacy services to persons enrolled in a BCBSNC health benefit plan, according to the terms and requirements of BCBSNC. *Id.* at ¶¶ 8, 11.

Because BCBSNC sells health insurance policies that constitute "health benefit plans" and pharmacies in BCBSNC's specialty pharmacy network provide pharmacy services to BCBSNC's members (i.e., the plan beneficiaries) pursuant to health benefit plan terms than reference the network, the network participation agreement becomes part of the health benefit plan. The "Pharmacy of Choice" statute therefore applies to BCBSNC's network relationships with pharmacies.

BCBSNC contends that the statute does not apply because the network participation agreement is not a "health benefit plan." The statute defines health benefit plans as "any accident and health insurance policy or certificate; nonprofit hospital or medical service corporation contract; health, hospital, or medical service corporation plan contract; HMO subscriber contract; plan provided by a MEWA or plan provided by another benefit arrangement." N.C. Gen. Stat. §§ 58-51-37(b)(3), 58-50-110(11). BCBSNC construes the definition narrowly, contending a "health benefit plan" is the "insurance policy or health benefit plan issued to an insured." Doc. 140 at 4. BCBSNC contends that even though some of its policies essentially require beneficiaries or participants to use an in-network pharmacy and even though the network agreement—not the insurance policy—governs pharmacies' participation in BCBSNC's network, the

statute does not apply. For several reasons, the Court concludes that the statute applies in this context.

First, courts "do[] not read segments of a statute in isolation." *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 188, 594 S.E.2d 1, 20 (2004). They "construe statutes *in pari materia*, giving effect, if possible, to every provision." *Id.* The statute as a whole is structured to ensure that beneficiaries and participants enrolled in health benefit plans using provider networks can select their pharmacy of choice. *See, e.g.*, § 58-51-37(e) ("The entity providing the health benefit plan shall, through reasonable means, on a timely basis, and on regular intervals in order to effectuate the purposes of this section, inform the beneficiaries of the plan of the names and locations of pharmacies that are participating in the plan as providers of pharmacy services and prescription drugs."); § 58-51-37(f) ("If rebates or marketing incentives are allowed to pharmacies or other dispensing entities providing services or benefits under a health benefit plan, these rebates or marketing incentives shall be offered on an equal basis to all pharmacies and other dispensing entities providing services or benefits under a health benefit plan . . . ."). The prohibitions in § 58-51-37(c) must be read in this context.

Second, as BCBSNC acknowledges, the statute is remedial. It protects residents' right to pick their pharmacy of choice by prohibiting insurers from excluding pharmacies from their network and granting aggrieved pharmacies and residents a remedy. *See Marshall v. Miller*, 302 N.C. 539, 546, 276 S.E.2d 397, 402 (1981) (characterizing a statute that "encourages private enforcement" and "provides a remedy for aggrieved parties" as remedial). "A remedial statute must be construed broadly in light of the evils

10

sought to be eliminated, the remedies intended to be applied, and the objective to be attained." *O & M Indus. v. Smith Eng'g Co.*, 360 N.C. 263, 268, 624 S.E.2d 345, 348 (2006) (cleaned up).  If BCBSNC's construction were adopted, BCBSNC could exclude pharmacies at will, so long as it used a network agreement to do so.

Third, the legislature understood that insurers offer health benefit plans with networks of health care providers.  Indeed, in other parts of Chapter 58, the legislature addressed how general provisions applied to plans with network providers.  *See* N.C. Gen. Stat. §§ 58-3-200(d), 58-50-30.  Section 58-51-37 assumes that some entities offering health benefit plans use networks for pharmaceutical benefits and imposes certain requirements based on that assumption.  For example, §§ 58-51-37(c)(1) and (c)(2) anticipate that pharmacies will participate in health benefit plans according to the terms offered by the insurer (i.e., participate in the network), and prohibit insurers from excluding a pharmacy as a contract provider.

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."  *See Sturgeon v. Frost*, 577, U.S. 424, 136 S. Ct. 1061, 1070 (2016).  When read in the context of the entire statute, § 58-51-37(c) applies to BCBSNC's network relationship with pharmacies.

### B. There are no disputed questions of material fact on the POC claims

There are not many cases interpreting Chapter 58.  *See* Doc. 78 at 5 n.1.   No court has clearly set forth the elements of "a violation of this section" or defined when a pharmacy is "aggrieved" by such a violation.

Senderra asserts that BCBSNC violated three subsections of § 58-51-37(c). A cause of action based on any of these subsections requires Senderra to show that it was "aggrieved" by the violation. N.C. Gen. Stat. § 58-51-37(h).

### 1. Prohibiting or limiting residents from selecting their pharmacy of choice

Section 58-51-37(c)(1) provides that "the terms of a health benefit plan shall not prohibit or limit a resident of this State . . . from selecting a pharmacy of his or her choice when the pharmacy has agreed to participate in the health benefit plan according to the terms offered by the insurer." § 58-51-37(c)(1) (immaterial provisions deleted for clarity). The Court construes the statute to require BCBSNC to offer pharmacies a fair opportunity to participate, which means that it must make its terms of participation available to all interested providers.

To establish a violation of this subsection, Senderra must show that BCBSNC's health benefit plans prohibited or limited residents of this State from selecting Senderra as their pharmacy of choice between October 15, 2018, and July 1, 2019, that Senderra agreed to meet, and did meet, the terms for participation offered by BCBSNC, and that Senderra was aggrieved by BCBSNC's actions. N.C. Gen. Stat. §§ 58-51-37(c)(1), (h).

It is undisputed that BCBSNC prohibited or limited residents of North Carolina from selecting Senderra as their pharmacy of choice from October 15, 2018, through July 1, 2019, in the sense that any resident who used Senderra paid more out of pocket for their prescription. However, all the evidence shows that BCBSNC made its terms available to Senderra through mailings and its website, that Senderra knew BCBSNC required an in-state dispensary, and that Senderra did not have an operational in-state

12

dispensing pharmacy when it applied to participate in the new network in June or when the old contract expired. Thus, Senderra did not meet a clearly communicated term required by BCBSNC before it could participate in the specialty pharmacy network.

Given that Senderra did not meet the terms offered by BCBSNC, it cannot show that BCBSNC violated § 58-51-37(c)(1) when it limited its plan beneficiaries from obtaining prescriptions from Senderra. In the absence of a disputed question of material fact, BCBSNC is entitled to summary judgment on this claim.

Senderra contends that BCBSNC did not clearly state its terms and requirements because it did not tell Senderra until sometime in October 2018 that Senderra needed to complete BCBSNC's credentialing process to satisfy the in-state dispensary requirement. Even assuming this is so, Senderra was not aggrieved by that purported violation because Senderra had not met the preliminary requirement of having a permitted in-state dispensing pharmacy. Senderra similarly contends that BCBSNC did not clearly state its terms and requirements because it did not tell Senderra it could satisfy the dispensing requirement through a corporate affiliate. But satisfying the dispensary requirement through a corporate affiliate was merely one way in which pharmacies with qualifying affiliations could satisfy the requirement— it was not an exception. Doc. 137-7 at 5–6. And BCBSNC had no obligation to give Senderra advice about corporate structures available under state law. The statute requires BCBSNC to make its terms available to interested pharmacies, not walk the pharmacy through how to meet those terms.

Next, Senderra contends that BCBSNC allowed other specialty pharmacies to participate in the network even though they did not meet all the new terms. Specifically,

13

it is undisputed that BCBSNC admitted two pharmacies, Avita and Long's, into the network even though their in-state dispensing locations did not have the URAC credential. Doc. 36-3 at 3; Doc. 48 at ¶ 41. But this does not matter, as Senderra did not have a permitted in-state dispensary. Assuming BCBSNC violated the statute by inadvertently offering different terms to different pharmacies, Senderra was not aggrieved by that violation since it did not meet the basic term imposed on all pharmacies and met by every pharmacy admitted into the network.

Finally, Senderra contends that BCBSNC enforced its contractual provisions about entry dates differently as to Senderra. As to this point, Senderra relies on the fact that some pharmacies signed their network participation agreements after October 1, 2018. *See* Doc. 137-2 at 5–6. But the agreement merely requires pharmacies to "submit all necessary paperwork that BCBSNC requires by 10/1 for a 1/1 entry date, and by 4/1 for a 7/1 entry date." Doc. 18 at p. 14 ¶ 2.14. It says nothing about a deadline for executing the participation agreement, *see* Doc. 137-2 at 6, nor is there any evidence that any pharmacies who executed their agreements after October 1, 2018, had not timely met the dispensing requirement.

### 2. Denying pharmacies the opportunity to participate as contract providers

Section 58-51-37(c)(2) provides that "the terms of a health benefit plan shall not deny a pharmacy the opportunity to participate as a contract provider under a health benefit plan if the pharmacy agrees to provide pharmacy services that meet the terms and requirements of the insurer." § 58-51-37(c)(2) (immaterial provisions deleted for clarity). To establish a violation of this subsection, Senderra must show that BCBSNC's health

14

Case 1:18-cv-00871-CCE-JEP Document 156 Filed 04/05/21 Page 14 of 19

benefit plan denied Senderra a fair opportunity to participate as a contract provider under its plan between October 15, 2018, and July 1, 2019, that Senderra agreed to meet, and did meet, the terms for participation offered by BCBSNC, and that Senderra was aggrieved by BCBSNC's decision. N.C. Gen. Stat. §§ 58-51-37(c)(2), (h).

BCBSNC is entitled to summary judgment on Senderra's claim based on this subsection for the same reason its § 58-51-37(c)(1) claim fails: Senderra did not meet BCBSNC's terms and requirements as of October 15, 2018, because it did not have a permitted in-state dispensary. That term was clearly communicated back in April 2018. The evidence was undisputed that the other terms were available on referenced websites and materials. Moreover, Senderra was not aggrieved by BCBSNC's alleged violations based on how BCBSNC communicated other terms and requirements for participation to Senderra or how BCBSNC applied other terms and requirements, given Senderra's undisputed failure to have an in-state dispensing location which could lawfully operate by the deadlines imposed by BCBSNC and given that all pharmacies admitted into the network met this basic requirement.

### 3. Imposing a monetary advantage or penalty upon pharmacies

Section 58-51-37(c)(4) provides that "the terms of a health benefit plan shall not impose a monetary advantage or penalty under a health benefit plan that would affect a beneficiary's choice of pharmacy." § 58-51-37(c)(4). To establish a violation of this subsection, Senderra must show that BCBSNC imposed a monetary advantage or penalty that would affect a beneficiary's choice of pharmacy and that Senderra was aggrieved by the advantage or penalty. N.C. Gen. Stat. §§ 58-51-37(c)(4), (h).

BCBSNC is entitled to summary judgment on Senderra's claim based on this subsection for the same reason its other claims under § 58-51-37(c) fail: Senderra cannot show it was aggrieved by any of BCBSNC's alleged violations.

Senderra contends that BCBSNC imposed a monetary advantage on Avita and Long's when it allowed them to participate in the network even though neither pharmacy had the URAC credential by the June 8, 2018, deadline and allowed them to remain in-network beyond the 30-day cure period without the URAC credential. It is undisputed that the pharmacies failed to obtain the URAC credential by the June deadline or within the 30-day cure period. *See* Doc. 137-7 at 3. But, as with its other claims, because Senderra had not satisfied the dispensing requirement, it was not aggrieved by the fact that BCBSNC effectively excused two pharmacies who did meet that requirement from complying with an additional URAC credentialing requirement.

Finally, Senderra contends that the requirement that pharmacies have an in-state dispensing location was itself a "monetary advantage or penalty" and that BCBSNC violated § 58-51-37(c)(4) by imposing this requirement. But the statute explicitly gives insurers the discretion to determine the terms and requirements that pharmacies must meet to serve as contract providers under their health benefit plans. N.C. Gen. Stat. § 58-51-37(c)(1), (2). It does not require that the terms and requirements benefit beneficiaries or participants in any particular way, nor does it impose any sort of objective reasonableness requirement.

16

### 4. BCBSNC is entitled to summary judgment on the POC claims

Senderra has not shown that there are disputed questions of material fact that, if decided in its favor, would support a judgment in Senderra's favor. The undisputed facts show that Senderra did not have a pharmacy in North Carolina by the required date, that it had not met a basic term imposed by BCBSNC for network participation, that all pharmacies admitted into the new network met this requirement, and that, as to this basic term, Senderra was not treated differently than other specialty pharmacies. BCBSNC is entitled to summary judgment on this claim.

### II. BCBSNC is entitled to summary judgment on the fraud claims

To state a claim for fraud, the plaintiff must show (1) a false representation or concealment of a material fact, (2) that is reasonably calculated to deceive, (3) is made with the intent to deceive and (4) does, in fact, deceive, (5) resulting in damage to the injured party. *Forbis v. Neal*, 361 N.C. 519, 526–27, 649 S.E.2d 382, 387 (2007). The plaintiff's reliance on the alleged concealments or misrepresentations must be reasonable. *Pearson v. Gardere Wynne Sewell LLP*, 814 F. Supp. 2d 592, 605 (M.D.N.C. 2011). Senderra's evidence is insufficient to establish disputed questions of material fact as to several of these elements, but the Court will limit its discussion to the reasonable reliance and damages requirements.

Senderra contends that BCBSNC concealed or misrepresented material facts about its dispensing requirement by telling Senderra that the only requirement it had not met was having an in-state dispensing location and failing to mention that Senderra had to obtain the URAC credential and Medicare certification for its North Carolina dispensary.

17

Senderra further contends that it reasonably relied on the alleged misrepresentations because information clarifying the dispensing requirement was not readily accessible to Senderra. As discussed *supra*, Senderra understood that BCBSNC had a credentialing requirement: It submitted a credentialing application when it joined the network, Doc. 49 at ¶ 17, and a recredentialing application in December 2016, Doc. 55-1 at 3, which included the URAC credential. Information clarifying the credentialing process was also available on BCBSNC's website at all relevant times. Doc. 88 at ¶¶ 6–15. Many other pharmacies timely met the credentialing requirements and were admitted into the new network. *See, e.g.*, 48 at ¶ 11 (noting that four "newly credentialed" pharmacies submitted the verification form to participate and that 24 pharmacies satisfied the requirements and became participating providers in the new network). Senderra has not offered any evidence that anyone at BCBSNC ever told Senderra that it did not have to meet the URAC credentialing requirement specifically or other credentialing requirements generally, nor is there any evidence that anyone at Senderra ever asked BCBSNC about credentialing, certification, or the URAC requirement. While a party who chooses to speak "must make a full and fair disclosure as to the matters he discuss[ed]," *Ragsdale v. Kennedy*, 286 N.C. 130, 139, 209 S.E.2d 494, 501 (1974), BCBSNC was not required to read its requirements verbatim to Senderra.

Even if Senderra's reliance on the alleged misrepresentations was reasonable, it has not introduced any evidence showing that its reliance resulted in any cognizable harm. Senderra had not obtained the Board of Pharmacy permit, as required by law, N.C. Gen. Stat. §§ 90-85.21(a), 90-85.3(m), 90-85.3(q), by October 15, 2018—the date the

18

termination of the contract was effective. Senderra obtained the URAC credential—the requirement allegedly falsely misrepresented—in March 2019 and reentered the network at the earliest entry date possible after its termination. *See* Doc. 18 at p. 14 ¶ 2.14. Thus, any false statements or omissions about the URAC credential requirement did not extend the length Senderra was excluded from the network.

Senderra has not presented evidence sufficient to raise disputed questions of material fact as to the elements of a fraud claim. BCBSNC's motion for summary judgment will be granted and this claim will be dismissed.

### III. BCBSNC is entitled to summary judgment on the Chapter 75 claims

Senderra relies on its fraud and pharmacy of choice claims as the basis for its Chapter 75 claims. Its Chapter 75 claims fail for the same reasons the fraud and Chapter 58 claims fail. *See AMEC Env. & Infrastructure, Inc. v. Structural Assocs., Inc.*, No. 7:13-CV-21-BO, 2015 WL 1000766, at *8 (E.D.N.C. Mar. 5, 2015) (granting summary judgment for UDTPA claim, which was based on fraud, where the evidence underlying the fraud claim was insufficient).

It is **ORDERED** that the defendant's motion for summary judgment, Doc. 127, is **GRANTED** and the defendant's motion to exclude expert report and testimony, Doc. 133, is **DENIED** as moot. Judgment will be entered as time permits.

This the 5th day of April, 2021.

						_____
						UNITED STATES DISTRICT JUDGE